The next case this morning is number 5210381 O'Malley etc. versus Adams etc. at all. Arguing on behalf of the appellant estate is Courtney Cox. Arguing on behalf of the Appalachia Bridgeview Bank is Bo Griman. Each side will have 15 minutes for their argument. The appellant will also have five minutes for a rebuttal. Please note only the clerk is permitted to record these proceedings. Good morning, everyone. Good morning, Justice Warden. We have President Justice Cates and Justice Welch. Are you prepared to proceed? Yes, Your Honor. We are. Uh huh. Mr Cox, you may proceed. Thank you, Your Honor. May it please the court. This is an appeal 304 a appeal involving several issues. Um, I'll begin by explaining that on October 15th 2019 Judge Shaner dismissed all but one claim against the bank and that one claim was for unjust enrichment. He specifically found in his order that the allegations in our complaint were sufficient to state a cause of action for unjust enrichment. And that finding has never been challenged. That finding was consistent with the Supreme Court's decision in the H. P. I. Case in 1989. I need to point out at this at this time that three days after Judge Shaner issued that order, the bank dumped what it calls nine plus gigabytes of data containing thousands of pages on us. Those previously unproduced documents that we received three days after Judge Shaner's order contained documents that formed the basis for the four additional accounts we have filed in addition to the unjust enrichment claim. Those were not available to Judge Shaner at the time we made his previous ruling. Judge Shaner then recused himself from the case after conducting a settlement conference that was unsuccessful and Judge Ligon was then assigned to hear the case. Judge Ligon eventually dismissed all four of these additional claims for failure to state a claim and also granted a motion for summary judgment on the unjust enrichment claim. Now, contrary to Judge Shaner's ruling permitting the unjust, unjust enrichment claim to stand alone, Judge Ligon granted summary judgment, dismissing that claim by a docket entry, which didn't provide an explanation for the ruling. But it is believed that the ruling was based on the case cited by the bank. It was a case from this court, the Fifth District, in 1985. That was four years before the HPI case in the Supreme Court. That was Charles Hester Enterprises versus Illinois Founders. In the Charles Hester case, the court found the unjust enrichment claim is not a separate cause of action, and it's essentially only a remedy for some sort of separate cause of action based on wrongful conduct. However, the decision in HPI essentially overruled that the finding in the HPI case was there are three circumstances in which unjust enrichment can be found. One of them requires wrongful conduct. Two of them do not. For example, the first cited by the Supreme Court in HPI. And by the way, that case has not been overruled. It still stands as good law in Illinois. First, where the benefit should have been given to the plaintiff, but a third party mistakenly gave the benefit to the defendant. No wrongful conduct is required in that situation. That occurred here, where the defendant procured the benefit from a third party through some type of wrongful conduct. That also occurred here. And third, where the plaintiff, for some other reason, has a better claim to the benefit than the defendant. That also applies here. Supreme Court in HPI made the following statement, which has been repeated by this court in two cases, at least one by Justice Cates and one by Justice Bouie. That's a stated cause of action. Based on a theory of unjust enrichment, a plaintiff must allege the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity and good conscience. That statement is important because it recognizes that first, unjust enrichment is a cause of action, and it sets out exactly what has to be alleged to allege that cause of action, which we have done. That case, that case was specifically served by Justice Bouie and the Robinson Combs St. Clair Nissan case in 2019. Now, after the Supreme Court made that ruling in 1989, there were some courts in Illinois, some appellate courts, that refused to follow them, continuing to say that, well, you must have wrongful conduct. It cannot stand alone. It must be connected to some other claim, essentially. And those are cited in our brief. We pointed them out to you. Those are in the minority. Most most courts have correctly followed that decision. For example, uh, and I will say that the bank said there were no there was no decision in Illinois that found it could be a standalone claim. We pointed out several cases where that's not the case. In fact, the opposite is true. One is the Tummelson case from the fourth district. There was only one claim brought in that case. It was for unjust enrichment, a single cause of action, and the trial court granted a remedy based on that single cause of action. First district in the Apollo real estate case the same. Uh, there in that case, it was very similar to this case in that there was there were several claims brought. All were dismissed except one. The unjust enrichment claim, just like this case there. Just like this case, they moved for summary judgment. The defendant did, and and the appellate court there followed the H P I case and said, No, it can be an independent, standalone cause of action, which is what we're asking the court recognized in this case. There's another case. Mr Cox assumed hypothetically that we recognize this as a separate standalone cause of actions. What is the question of fact here that you would say precludes the entry of summary judgment? Well, the question of fact is raised by the defendant in a number of ways in that they say, for example, the gas didn't belong to us. They had a lean on the gas. We can't tell one molecule from another. They raised numerous factual issues, but none of those were addressed in the motion for summary judgment. It was simply based on, you know, the fact that, uh, it's a identify the specific, uh, monies that came. We can. And so there are a number of different factual issues that would preclude summary judgment, except they didn't bring it based on the lack of a factual issue. The fact they brought it based on the fact that it's a standalone claim. So so what we're asking, so even though we know that the judge didn't enter a pleadings, it must have been the stand alone claim issue. Yes, Your Honor. And that's because the bank specifically cited the Charles Hester case and didn't raise, uh, other issues that would be normal in the summer judgment. So I think we can safely conclude that was the basis for it. Um, and and, uh, it would be, um, our view that it should be overruled and sit back because Charles Hester was overruled by the Supreme Court. Andi, we just asked this court to follow the majority and find that there are there will be, I believe, based on the filing in this case in the appeal, a lot of factual issues. But, um, the law of the case is it stands now is we've stated a cause of action, uh, and and can proceed on that. Uh, to flesh it out a little bit further, uh, the question of factual issues. Um, there and these air continually raised by the bank in its, uh, in its brief. For example, they say the pray their trust does not own half of the mills. Well, that's been determined by the court and, in fact, admitted by the bank. We cited in our brief, uh, a filing that Mr Grime and made in the bankruptcy court, uh, in which he admitted that we own the minerals. And he makes some very interesting comments there that I think are important. Um, it says he said to the court in the bankruptcy court Putnam. Now, Putnam is the operator of the oil project. They're the producer said Putnam may have been. No, let me back up. Putnam does not deny the pray their trust owns 50% of the minerals being exploited by 67% of Putnam's wells, nor does it claim it had a lease entitling it to exploit those minerals, he says. Under the circumstances, there's only one conclusion that can be drawn. Putnam may have been removing and selling large amounts of gas from Patrick O'Malley Trust parcels for years without having any right to 50% of that gas. So now he's arguing, Well, we don't own it or we have a lean on it. You can't have a lean on something that you have no right to. Uh, they certainly have a lean on Patrick's side of it. There's no question. But they have admitted it. And here he went on to say in the bankruptcy, as for the title policy, alleged as allegedly obtained by Patrick O'Malley Trust, it does not give Putnam a license to take gas belonging to someone else. They have no lien on our property, and therefore that is also a matter that will be decided in the trial. They say they're simply competing creditors. We're not a creditor. We're trying to get property that belongs to us. Then they make some fascinating arguments in their brief, and they say none of the gas belongs to us. Then they say, um, we didn't have any interest in a specific molecule of gas. Yes, we own an undivided one half interest as a pro tenant in every single molecule that comes out of the ground. Then they make an even more. Is that really? Is that the case? Does the case? Is there a case that you have that supports that argument, Mr Cox? There is not, because no one has ever made that argument that I can find. Well, there is some case law that seems to indicate that when the minerals are underground, they don't seem to belong to anybody except you have the right to produce them or harvest them. That's true. It's only when they're harvested that they then have ownership rights. That's right. Once once the molecule comes out of the ground, uh, is becomes personal property and is subject to ownership. And every molecule that comes out of the ground belongs to the co tenants because they own an undivided one half interest in the mineral estate. They then argue that because it was commingled in the pipeline, there is no way to tell when it comes out of the other end of the pipeline who owns what? If that were true, it would put an end to the oil and gas industry in Illinois because you wouldn't be able to know who to pay for it. And so then they argue this rule of capture, and this may be along the lines you're thinking about judge. The rule of capture applies to adjacent owners. If you own a parcel next to me, I have the right to capture it on my land, and you have the right to capture it on your land. But the rule of capture does not apply to co tenants who each own an undivided one half of the mineral estate. It simply does not apply. So what we have here is an admission, repeated admission by the bank. Now I have others examples. I won't repeat here, but you have this admission that we own half of it, that Putnam had no right to take it, and that it even goes on to say that if this, it says half of the royalties for the working interest would be paid to Patrick O'Malley Trust, and the other half of the minerals taken would be paid to us. Now, that's what they said earlier. Now they've changed that to say, oh, no, we didn't own any of it. So there are numerous factual issues that will need to be decided in the trial of this matter. But the only thing preventing the trial was the decision of the court, essentially, that the claim couldn't stand by itself. And it's standing by itself because the court denied or dismissed the other four claims that we brought for forgery, mail fraud, and the like. In the time I have, I can't address all of those issues. I refer the court to our brief on it. We've tried to be complete about that. But if you have any questions about those, I would be happy to answer them. Mr. Cox, one question, if I might, Justice Wharton. Mr. Cox, as to the other counts, they seem to be based on an underlying conspiracy theory, fraud, things like that. And yet, I don't recall seeing any conspiracy allegations. Did I miss that? They're not based on conspiracy allegations. They're based on this point, Judge. And it's this. The bank, knowing that it had no lien and admitting that it had no lien on our half of the minerals that were removed, has asserted repeatedly in various documents that it does have a lien on our interests. That underlies all of those. And we learned all of those documents in that that dump of documents that came to us after Judge Shaner ruled. And when we saw all those essentially materially false documents, it led us to the forgery. It led us to mail fraud. It led us to conversion. And it led us to based on different documents that were before Judge Shaner. That's essentially what happened. The bank said, we're going to go out and we're going to try to get. Now, this is before we even knew that they were taking our minerals. We're going to go out and try to get all that we can from the sale of those minerals to satisfy our debt, including those belonging to us. Understood. Thank you so much. Any questions? No questions. Mr. Breiman. Yes, Your Honor, I'm ready. May it please the court and counsel. My name is Beau Breiman and I represent the appellee. Now, Bridgeview and the appellant, which I refer to as the Prather Trust, are really just rival claimants. They both have a gas field. The difference between the two claims is this, though. Bridgeview's claim is a secured claim. When Bridgeview, and it arises out of a loan. Bridgeview made a loan for $1.8 million to Putnam. It secured that loan with a mortgage. The mortgage covered not only the mineral leases that Putnam had for the gas field, but it also included the proceeds. That gave Bridgeview a lien in all of Putnam's gas revenues. In addition, when Putnam defaulted on the loan, Bridgeview filed a lawsuit, won a $1.8 million judgment, and then started attaching Putnam's assets. One of the things it did was issue a citation to Putnam. By law, the service of that citation gave Bridgeview another lien in the gas revenues. Another thing that Bridgeview did was issue a citation to Lincoln Land. Now, Lincoln Land is the company that buys all the gas, or used to buy all the gas from the gas field when it was operating. And so that gave, by law, the service of that citation gave Bridgeview a third lien in Putnam's gas revenues. Now, the Prather Trust claims they're a little different. They arise out of that mineral dispute regarding the O'Malley parcel. The claim is unsecured, and during the relevant time period that's alleged in the complaint, that claim hadn't even been asserted. No one even knew if the claim would be asserted. Now, the Prather Trust has since filed a lawsuit, this lawsuit, asserting the claim. However, it has never won a judgment against Putnam, and it has never gotten to the stage where it could even begin attaching any of Putnam's assets. So with that background in mind, let's focus on the adequate protection payments that Bridgeview received during Putnam's bankruptcy. Let me ask you one question. You don't think that a reservation under a deed that's publicly recorded gives the trust any kind of security interest in the minerals? I don't think it... What it gives it is an interest in real estate, right? Clearly, if that mineral reservation is upheld, then it has a right to 50% of the minerals for the O'Malley farm. That is an interest in real estate. That gives them the shared right to produce gas, but that doesn't translate into any ownership of any specific gas produced from the field, molecules, as Mr. Cox has said, and it also doesn't translate into any specific ownership in dollars in Putnam's account. That's what we're saying. In other words, the real estate interest is two steps removed from owning dollars in Putnam's that they... We have two creditors here, only one of which is secured. My question is, is there any security interest that runs to the trust because of a publicly recorded deed that your client should have been known about? I don't think so. It gives them an interest in the real estate. That's what I think. Not an interest in any dollars. So maybe what I should say is it's unsecured insofar as we're talking about Putnam's gas revenues. Maybe that's what I should have said. So let's talk about the adequate protection payments in the bankruptcy court. Those are the only... That's a good place to start because that is actually the only money identified in the Prather Trust complaint as being money that Bridgeview supposedly took after it knew about the Prather Trust's potential mineral rights. So essentially, Bridgeview is being called a thief. It's being accused of conversion for having taken court-ordered, court-authorized payments during Putnam's bankruptcy. Is that a good theory? No, for several reasons. Number one, the bankruptcy court's orders could not be for the bankruptcy court. That's black letter law in Illinois. That should be the end of the case right there. If you move beyond that, the question is, did Bridgeview do anything wrong or can it be sued for following the orders of the bankruptcy court? The answer to that question is also no because there's an absolute litigation privilege that applies and protects Bridgeview from being sued in a subsequent case about something it did in a prior case. That's also black letter law. So that should also be the end of the case. But if we move beyond that and we ask the next question, which is, well, did the bankruptcy court make an error or did Bridgeview commit conversion in following that order? The answer to those questions is also no because Bridgeview had those three liens in Putnam's gas revenues. What did Bridgeview know at the time they made application to the bankruptcy court? Didn't they know that there was a potential interest by this trust? They did and they disclosed it to the bankruptcy court. Well, did they commit a fraud on the court by the tenor of their disclosure? No, I mean, we couldn't disclose it. Bridgeview could not have disclosed it any clear. It said, hey, Bridgeview was trying to get a trustee appointed for Putnam. It was trying to come up with a laundry list of reasons why the management for Putnam should be removed from running Putnam's company during the bankruptcy proceedings. And they were ringing the bells loud and hard about these potential mineral rights. But the bankruptcy court determined. Well, one more question. Was notice given to the trust at the time of the bankruptcy proceeding? No, I don't. As a potential creditor? I don't believe it was. Now, so had the trust been given notice, it could have entered into the proceedings and made its claim at that point. And it could have also. Yes, it wasn't given the opportunity, even though the bankruptcy court to give notice to the trust. When you file a bankruptcy case, notice the list of creditors is compiled by the debtor. Putnam is the one who had the responsibility to list all of the creditors. And then the bankruptcy court. So you're saying that as a creditor, even though, you know, there's another creditor out there, you can sit on your hands and still that's your argument? Yes, because when you're just when you're rival creditors, no creditor has a fiduciary duty to protect the other creditor. And what more could have Bridgeview have done in the bankruptcy case besides disclose it? It's not the one in charge of saying who gets notice of what all it can do is disclose to the bankruptcy court. Hey, this is one of the this is one of the issues that's out there. And it did that. Furthermore, Bridgeview felt and the law backs it up. It had a right to receive payments from Putnam's gas revenues, because Putnam's money belonged to Putnam. It was property of the bankruptcy estate. And the judge in that bankruptcy case had jurisdiction over those over those assets, had the authority to decide how they would be distributed. And Bridgeview was a good candidate for receiving some of that money. Another one way to look at this case is to look at did Bridgeview even receive a higher percentage than the credit trust says they were supposed to receive? If you look at the entire life of the of the gas field, there's an affidavit that was submitted by the credit trust that shows that Bridgeview received 21% of the money. So $0.50 of every dollar was available to pay Bridgeview. Why is it that every dollar that Bridgeview received is being called tainted. But every dollar that everyone else received is considered untainted. There were 15 different creditors, besides Bridgeview, so a total of 16 different parties who received payments out of Putnam's bankruptcy. One of those parties was the U.S. trustee. The credit trust hasn't sued any of those parties. What the credit trust is essentially asking for is a pre-litigation equitable hold or attachment on Putnam's assets. I think we all know that if you file a case and then immediately try to freeze the assets of the defendant, that that will not happen. The courts will not allow that. That's called an equitable prejudgment attachment. It's considered abhorrent under the law and it's not allowed. In order to start attaching the defendant's assets, you need to win your case. You need to do what Bridgeview did. You need to follow the steps that Bridgeview followed. The credit trust has never completed those steps. So it has no right to attach the assets of Putnam. There's not been a single case that's been cited by the credit trust for the proposition that you can have some kind of pre-litigation equitable attachment of another party's assets. Also, there's been no case that's been cited by the credit trust that holds that merely receiving payments from a gas or oil and gas company is actionable if there happen to be some discrepancies with that oil or gas company's leases. That's never happened to my knowledge anywhere in the United States. Can you imagine if that was the law? In this case alone, there'd be more parties and more attorneys that would have to show up in Crawford County than the courtroom could hold to explain why they shouldn't have to disgorge the money that they received from Putnam. So, I guess with the time I have remaining, I want to quickly talk about these so-called judicial admissions. Judicial admissions- Before you do that, could you address Mr. Cox's argument about the issue of unjust enrichment as a separate standalone account? Yes, I can. Is there any? Okay, thank you. Sorry to jump on it too fast. Yes, I can. There hasn't been a single case in Illinois that has held that an unjust enrichment claim can be a standalone claim. There have been a few cases where some standalone claims appear to have survived, but there's no evidence that any of the parties identified it as an issue and none of the courts discussed it. Now, there have been four appellate courts that have specifically addressed the issue. There are probably more than that, but the most recent cases from all the different districts all line up and say there can't be a standalone claim. The most recent case from the first district says that. The most recent case from this district says that, most importantly, and the same goes for the third and fourth districts. And what case are you relying on for the fifth district? The Charles Hester case. The cases from the other jurisdictions, well, I cited them in the brief. I could try and scramble to find them, but yeah, so the authority is 100% from the appellate courts is in favor of saying there's no standalone claim. Also, it's not true that Bridgeview only argued that the only reason why the unjust enrichment claim should go away is because of the standalone issue. That was the basis of the trial court's ruling, but Bridgeview has always maintained that even if you get beyond that issue, there's no unjust enrichment here because you get back to the issues of title to money. Title to money is presumed to be with the person that possesses it, and there's nothing to dislodge that presumption there. That means Bridgeview was entitled to treat Putnam's money like it was. Bridgeview never had any knowledge that any dollar that it was receiving specifically and exclusively belonged to the Prather Trust. And we also submitted an affidavit that went through the entire history of the loan after Bridgeview supposedly found out about the Prather Trust mineral rights and showed how the vast majority of the money came from collection efforts that had nothing to do with Putnam or Putnam's gas revenues. They were against the principles of Putnam and their own personal bank accounts or their own personal lawsuits. The only money that came across, this affidavit showed, after Bridgeview knew about this mineral rights dispute was the adequate protection payments and possibly another $16,000 of miscellaneous payments, which we don't know the source of, but even if it was Putnam's gas revenues, all the things we've talked about previously would show that that can't be the basis of an unjust enrichment claim. I understand your title to money argument as far as that goes, but once you had knowledge, are you saying that a party that has knowledge that they're taking money that potentially does belong to another predator can still use the title to money argument and take with no regard as to the other ownership rights? There's no unjust enrichment there, in other words. Yeah, if Bridgeview took a dollar, knowingly took a dollar that it knew belonged to the Prather Trust, legally belonged to the Prather Trust, that might be a problem, but there isn't a single dollar that Bridgeview ever took that definitively belonged to the Prather Trust were just rival claimants that were chasing Putnam, and Bridgeview was winning the race because it followed all the proper legal procedures and completed all the proper legal steps first. The Prather Trust never completed the steps to ever attach any of Putnam's assets, and its ownership in the mineral rights can't be translated into ownership into any specific dollars, so Bridgeview never had any knowledge of any specific dollar it was taking, and that's why those so-called judicial admissions from the Putnam bankruptcy and Lincolnland citation proceedings are completely invalid. Those statements are from different cases, so there can't be judicial admissions right there. Also, they never once say that Bridgeview's rights are inferior to Putnam's. That alone excludes them from being judicial admissions, and in addition, they all involve legal analysis. If I were to say today that, hey, it's illegal for banks to make loans, would that change the law for Bridgeview? Would Bridgeview have to close this loan department tomorrow? No. Courts decide what the law is. Nothing you say in a different case can change the law of Illinois and change the law that applies to you, so there was nothing that was said in those cases that is contrary to Bridgeview's theory in this case, and even if there was, it couldn't change the law. Thank you. Thank you. Justice Welch? No questions. Mr. Cox, you may respond. There we go. There we go. Thank you, Judge. I think the central issue that's become about during these arguments this morning is this. Are we a creditor, or are we an owner? We own one half of the minerals, and when those minerals come out of the ground, we still own one half of the minerals that are taken out of the ground, and here's how we can say that. We just had a Rule 308 appeal that came up to the court, and the court denied it, and it was on this issue. Can one co-tenant in minerals remove and sell the minerals without the permission or consent of the other co-tenant? The answer is no. Illinois law is clear that one co-tenant cannot remove and sell the minerals without the consent of the other co-tenant, with one exception. Under the Oil and Gas Act, there was no permission to do that. None of that occurred here. They didn't have our consent. We didn't know they were removing it, and they didn't apply to the circuit court for that, but that recognizes that the reason you can't remove minerals belonging to a co-tenant without their consent is that they still own the minerals in the same percentage once it comes out of the circuit court. That's settled law in Illinois. Mr. Cox, now you're talking about a bank that's got a security interest from a judgment, so you're not talking about the co-tenant. You're talking about a third party that's removed. What about them? What I'm talking about, Judge, is that they had no lien on our half of the minerals. They only had a lien on the half of the minerals belonging, which their interest was in the lease. They had a security interest in the lease. The lease was with Patrick, was not with us, and it did not reach our half. There was no lease, and so that's why we have these admissions that we've talked about. It is known that this time the lessor does not in fact own 100% of the minerals in connection with the lease, and so we own personal property that was removed and sold. The bank had no lien on it. There was no lease on it, and they have no right to it, so they have a lien on one half, but not our half, so it's a question of ownership rights and not competing creditors. It's ownership. Let me the idea of conspiracy. You're going to see in the complaint that as early as September 2014, the bank knew about our presence there. They also knew and acknowledged in a writing that the plan was of everyone was to allow the period for adverse possession to take place, not tell us they were taking it, which they did take, and then file for adverse possession. That's what started this case. The bank knew that from the beginning, and during that seven-year period while they're waiting for the adverse possession to ripen, they're going out asserting liens on minerals they know belong to us, and so at this point, if you want to call that a conspiracy, they knew and gave no notice to us. Why not? Because it would have ruined the adverse possession plan that they had agreed to, and so when we get to we see their collusion with everyone else in not telling us, and at no point did anyone give us notice or tell us what was going on, but rather all tried to grab all that they could. In fact, did so. I would add this one thing in final note. I'm just in Richmond. Under two of the so it is our position that applying those criteria and unjust enrichment goes back to the beginning of time when the bank started receiving money that belonged to us. Thank you. Justice Welch? No questions. Any further questions? Justice Cates? No, thank you. Gentlemen, we'll take this under advisement, and you'll hear from us forthwith. Thank you very much. Thank you, Ron.